UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 9:16-CV-80076-ROSENBERG/BRANNON

INSPIRED DEVELOPMENT GROUP,
LLC, a Florida limited liability company,

    Plaintiff,

v.

INSPIRED PRODUCTS GROUP, LLC,
d/b/a KIDSEMBRACE, LLC, a California
limited liability company,

    Defendant.
_____/

INSPIRED PRODUCTS GROUP, LLC,
d/b/a KIDSEMBRACE, LLC, a California
limited liability company,

    Counter-Plaintiff,

v.

INSPIRED DEVELOPMENT GROUP,
LLC, a Florida limited liability company, and
MITCHELL PRINE, individually,

    Counter-Defendants.
_____/

**AMENDED[1] ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT INSPIRED PRODUCTS GROUP'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF INSPIRED DEVELOPMENT GROUP'S MOTION FOR SUMMARY JUDGMENT**

    This matter is before the Court on Defendant Inspired Products Group's ("IPG") Motion for Summary Judgment [DE 74] and Plaintiff Inspired Development Group's ("IDG") Motion for Summary Judgment [DE 77]. Both motions have been fully briefed. For the reasons set forth below

---

1 This amended order corrects a typographical error on page 14. *See* DE 141.

Defendant IPG's Motion for Summary Judgment is granted in part and denied in part and Plaintiff IDG's Motion for Summary Judgment is denied.

## I.     UNDISPUTED FACTS[2]

For background information purposes, the Court sets forth below the undisputed history of this case. To the extent there are disputed facts relevant to the Court's decision, the Court addresses the dispute in its analysis, *infra*.

This case is about one company that produced products, the Defendant, one company that owned the patents for those products, the Plaintiff, and the Defendant's eventual termination of its relationship with Plaintiff. The Plaintiff in this case, IDG, was founded in 2005. DE 75 at 2. IDG was founded by Mr. Mitch Prine (who became the CEO) because Mr. Prine wanted to commercialize the idea of making child car seats that incorporated famous cartoon and comic book characters. *Id.* Mr. Prine succeeded in obtaining patents for his idea, however, at that time, neither Mr. Prine nor IDG obtained any rights or permissions to use the intellectual property of the characters the car seats were patterned after, such as Batman. *Id.* at 3. In 2006 and 2007, Mr. Prine was able to convince investors to form a company to manufacture the car seats and, as a result, the Defendant in this case, IPG, was formed. *Id.* The design of the business was such that IPG would manufacture the car seats and pay a royalty to IDG for the use of its patents. *Id.* In 2007, a formal Exclusive Patent Licensing Agreement was entered into between IPG and IDG that memorialized this arrangement wherein IPG would pay royalties to IDG. *Id.* at 4.

In January of 2008, IPG signed a non-exclusive license agreement with Marvel to put a

---

2 The Court previously granted the parties' respective motions to seal both the dispositive motions before this Court and the exhibits and record attached to those motions. The Court has endeavored to minimize the amount of material quoted and cited from those sealed filings, however, the Court has necessarily quoted portions of those filings that are germane to its decision due to the public's right of access to the judicial system and, by implication, the public's right of access to materials critical to the disposition of a dispositive motion. *See, e.g.*, *United States v. Amodeo*, 71 F.3d 1044, 1050 (2d Cir. 1995).

2

Spiderman character on children's car seats.[3]  *Id.* at 15.  The terms of that license agreement (as well as others) would eventually fracture the relationship between IPG and IDG, as explained below.  In 2009, IPG sought investment from Boliari, EAD, a Bulgarian corporation.  *Id.* at 5.  As a condition for its investment, Boliari required both IDG and IPG to execute a Binding Letter of Agreement.  *Id.* at 6.  The terms of the Binding Letter Agreement were varied, but the terms included a provision that stated that IDG would be entitled to a certain amount of funds if IPG were ever to be sold.  *See id.*

After the Boliari investment, in early 2010, Mr. Prine was removed as CEO of IPG.  *Id.* at 8.  After Mr. Prine's removal, the new leadership at IPG began to question the value of IDG's patents and the value of IPG's payments for the use of those patents.  *See id.* at 8.  IPG's concerns were focused on the terms of its non-exclusive licensing agreements with the owners of the fictional characters the car seats resembled.  *See id.* at 7-8.  More specifically, the terms of IPG's various non-exclusive licensing agreements for the fictional characters required, in various ways, that IPG would "not use . . . the [images] in any manner likely to cause confusion or doubt in the mind of the public as to the ownership and control thereof or in any manner that does not make clear that the [image] is owned and controlled exclusively by [the licensor.]"  *See* DE 75-15 at 11.  IPG's concern was its requirement, pursuant to its non-exclusive licensing agreements, not to assert any sort of exclusivity over the character images, juxtaposed to the patents it was paying for, which in turn facially appeared to exercise exclusivity over the character images, once they were affixed to the car seat that was the subject of the patent.  *See* DE 75 at 22 ("[T]he licensed rights to the specific characters in combination with the Design Patent protection for the seat utilizing that character design, effectively precludes the licensor from granting a character license for a similar (i.e. infringing) seat.").  Stated succinctly, IPG was concerned the patents it was paying for had no value, conflicted with its license agreements, or both.  *See id.*

---

3 IPG was able to secure non-exclusive licensing agreements for many cartoon characters for its car seats.

3

In light of its concerns, IPG requested extensive information from IDG pertaining to the patents. *See id.* at 9. IDG did not respond to IPG's satisfaction. *See id.* IPG terminated its relationship with IDG by terminating the Patent License Agreement. *Id.* This lawsuit followed, with IDG asserting it was owed outstanding royalties under the Patent License Agreement and a lump-sum payment under the Binding Letter of Agreement. DE 1. IPG answered by filing counterclaims, however, those counterclaims were subsequently dismissed without prejudice. Only IDG's claims remain before this Court.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The existence of a factual dispute is not by itself sufficient grounds to defeat a motion for summary judgment; rather, "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A dispute is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Anderson*, 477 U.S. at 247-48). A fact is material if "it would affect the outcome of the suit under the governing law." *Id.* (citing *Anderson*, 477 U.S. at 247-48).

In deciding a summary judgment motion, the Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). The Court does not weigh conflicting evidence. *See Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007). Thus, upon discovering a genuine dispute of material fact, the Court must deny summary judgment. *See id.*

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact. *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). Once the moving party satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., LLC*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "[t]he non-moving party must make a sufficient showing on each essential element of the case for which he has the burden of proof." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Accordingly, the non-moving party must produce evidence, going beyond the pleadings, to show that a reasonable jury could find in favor of that party. *See Shiver*, 549 F.3d at 1343.

### III.   ANALYSIS

IPG has moved for summary judgment as to each count against it: Count I (Breach of Patent License Agreement), Count II (Breach of Binding Letter of Agreement), Count III (Unjust Enrichment), and Count IV (Promissory Estoppel). IDG has moved for summary judgment as to Count II. For the reasons set forth below, the Court grants summary judgment in IPG's favor on each count except for Count I and denies summary judgment in IDG's favor on Count II

**Count I – Breach of Patent License Agreement**

IPG argues that it is entitled to summary judgment as to IDG's Count I, which is a breach of contract claim premised on the parties' Patent License Agreement. IDG's breach of contract claim is based upon the allegation that during the fourth quarter of 2012 and all of 2013 IPG did not pay IDG royalties as the Patent License Agreement required. IPG's contention on summary judgment is that it was excused from any such obligation to pay royalties because, prior to its alleged obligation to do so, IDG materially breached the Patent License Agreement. IPG's position is premised upon the following provision in the Patent License Agreement:

5

6. **Obligations of Licensee.** In addition to the obligations set forth hereinabove, IPG shall fulfill the following obligations:
    a. Marking. Licensee agrees to mark or have marked all Licensed Products manufactured, used or leased by it or its sub licensees as such may be desirable or required by applicable patent laws.
    b. Diligent Exploitation. Licensee shall use its commercially reasonable efforts to bring Licensed Patent Rights to market through a thorough, vigorous and diligent program and to continue active, diligent marketing efforts throughout the life of this agreement.
    c. Protection Against Infringement. Licensee shall use its commercially reasonable best efforts to vigorously protect and guard against infringement of the Licensed Patent Rights incorporated in the Licensed Products throughout the life of this Agreement.
    d. Patent Prosecution and Maintenance. IDG and IPG shall cooperate with respect to all future patent prosecution and patent maintenance. IPG shall pay future costs of preparation, filling, prosecuting and maintenance of patents and applications on patentable improvements included in the Licensed Patent Rights, however, in the event that IPG refuses to file patent applications on such patentable improvements in the United States and selected foreign countries when requested by IDG, the rights to such patentable improvements for said countries shall be returned to IDG.

    i. Preparation and maintenance of patent applications and patents undertaken at IPG's cost shall be performed by patent attorneys selected by IPG (with the advance written consent of IDG, such consent not to be unreasonably withheld); and due diligence and care shall be used in preparing, filling, prosecuting, and maintaining such applications on patentable subject matter. Both parties shall review and approve any and all patent related documents.
    ii. IPG shall have the right to, on thirty (30) days written notice to IDG, discontinue payment of its share of the prosecution and/or maintenance costs of any of said patents and/or patent applications. Upon receipt of such written notice, IDG shall have the right to continue such prosecution and/or maintenance in its own name at its own expense in which event the License shall be automatically terminated as to the subject matter claimed in said patents and/or applications.

DE 1-1 at 7-8. IPG argues that IDG materially breached the section above because IDG did not "cooperate with respect to all future patent prosecution and patent maintenance" and IDG did not permit IPG to "review and approve any and all patent related documents."

"[U]nder Florida contract law a material breach of a contract excuses the non-breaching party from his obligation to perform under the contract." *Acquisition Corp. v. FDIC*, 760 F. Supp. 1558,

6

1560 (S.D. Fla. 1991).  A material breach "means a breach causing prejudice." *State Farm Mut. Auto. Ins. Co. v. Curran*, 135 So. 3d 1071, 1075 (Fla. 2014).  A material breach is a breach where a party "failed to perform a duty that goes to the essence of the contract and is of such significance that it relieves the injured party from further performance of its contractual duties."  *Burlington & Rockenbach, P.A. v. Law Offices of E. Clay Parker*, 160 So. 3d 955, 960 (Fla. Dist. Ct. App. 2015).  It is possible for a court to conclude that, as a matter of law, a breach of a provision of a contract amounts to a material breach.  *See Jyurovat v. Universal Prop. & Cas. Ins. Co.*, 84 So. 3d 1238, 1242 (Fla. Dist. Ct. App. 2012).  When the party accused of breach offers an explanation for its actions, however, the question of whether a breach was material is typically a question for a finder of fact. *Id.*

As an initial matter, the Court notes that the alleged breach at issue must "go[] to the essence of the contract and [be] of such significance that it relieves the injured party from further performance of its contractual duties." *Burlington*, 160 So. 3d at 960.  Here, the Court does not have an alleged breach before it that IDG refused to permit IPG to use its patents, which would almost certainly go to the essence of the contract.  Instead, IPG's position is that IDG essentially: (1) failed to communicate information and (2) took unilateral actions pertaining to its patents in lieu of collaboration.  IPG's record evidence to support these two contentions primarily consists of e-mails between IPG and IDG.

In those e-mails, IPG representatives stated that they "want[ed] to get a second opinion to determine the potential enforceable patent protection from a design patent filing" and that "[i]nformation was requested weeks ago."  DE 75-30 at 2.  IPG emphasized that "before [it] proceed[ed] with the filing of any new design patents . . . [it] want[ed] to do an independent evaluation of" its patent strategy.  *Id.* at 3.  Upon review, the e-mails provided by IPG do support the proposition that IPG wanted information pertaining to the patents, IDG was less than eager to provide that information, IDG was intent on sticking to its own business strategy with respect to the patents and, if

7

IDG ever provided the information requested by IPG, that production is not apparent from the above-referenced e-mails. IPG also cites to a letter it sent to IDG which states "IDG has not responded to [its] concerns." DE 75-32 at 2. IDG does not contest that letter in its response to IPG's statement of material facts. DE 103 at 8.

IDG has responded[4] to IPG's record evidence by providing its own series of e-mails. Although much of the content in those e-mails is irrelevant to whether IDG cooperated with IPG or otherwise took improper unilateral actions with respect to the patents, IDG has provided an e-mail in which an IDG representative stated that "If IPG would simply like a current status of all Patent Applications filed, a report providing such can be arranged" and "I'll bring IPG's request to [a patent attorney's] attention." DE 103-18. While evidence of IDG's production of the requested information is not in the court file, IDG has provided an e-mail which states that it responded to IPG's inquiries on several occasions, as well as having its patent attorney provide "a plethora of information." DE 103-19 at 3.

As set forth above, when the party accused of breach offers an explanation for its actions, the question of whether a breach was material is typically a question for a finder of fact. *Jyurovat*, 84 So. 3d at 1242. The Court concludes that this is precisely what must happen here. IDG did respond to IPG's requests in *some* fashion and, similarly, there was *some* level of interaction between the parties. IDG has provided evidence it forwarded IPG's request for information to its patent attorney and that the attorney provided "a plethora" of information. Similarly, IDG has raised factual disputes as to how and why it filed new patent applications without, perhaps, IPG's prior consent. The gravamen of IPG's argument is that this Court should look at *why* it needed the information it requested and, in light of that need, judge IDG's responses, actions, and cooperation as woefully insufficient. But this Court may not weigh evidence on summary judgment. The evidence before the Court does not conclusively establish

---

4 The Court finds it unnecessary to address IDG's procedural-based objections, such as waiver, in light of its decision to deny summary judgment as to Count I.

as a matter of law that IDG breached the Patent License Agreement in a manner which was so significant that it went to the essence of the contract and, as a result, IPG was relieved of its duty of performance under the agreement. *See Burlington*, 160 So. 3d at 960.  Instead, what the Court has before it is a dispute over the sufficiency of cooperation.  There are disputes as to: (1) what communication and actions were required under Section 6 of the Patent License Agreement, (2) whether a party breached those requirements, and (3) if those requirements were breached, whether that breach was material.  These are questions for a finder of fact and, as a result, IPG's motion must be denied as to Count I.

The Court has another ground for denying IPG's motion as to Count I.  The Court is unpersuaded that IPG has established on summary judgment that it suffered prejudice by virtue of the alleged breach by IDG because (1) IPG had the contractual right to discontinue payment of its share of the prosecution and/or maintenance costs of the patents and (2) IPG had the right to terminate the Patent License Agreement at any time without liability. *See* DE 1-1 at 8, 9.  A showing of prejudice is required to establish a breach is material, *State Farm*, 135 So. 3d at 1075, but the record evidence in this case shows that IPG maintained its relationship with IDG for an extended period of time after its requests for information notwithstanding its right to terminate not only as a result of IDG's alleged breach, but for any reason whatsoever.  In summary, for all of the reasons set forth above, IPG is not entitled to summary judgment as to Count I.

**Count II – Breach of Binding Letter of Agreement**

IPG argues that it is entitled to summary judgment as to IDG's Count II, which is a breach of contract claim premised on the parties' Binding Letter of Agreement.  IDG's breach of contract claim is based upon the allegation it was guaranteed a certain amount of royalties under that agreement and, because the relationship between the parties was terminated by IPG, that guaranteed payment is now

9

due.  IPG argues it is entitled to summary judgment on this count on two grounds.  First, IPG argues it is entitled to summary judgment because the Binding Letter of Agreement did not impose upon IPG any requirement to guarantee a certain amount of royalties to IDG.  Second, IPG argues that it is entitled to summary judgment because the conditions upon which IDG would receive a guaranteed royalty payment, pursuant to the Binding Letter of Agreement, were undisputedly never met.  The court addresses each of these grounds separately below, as well as one other matter pertaining to the enforceability of the Binding Letter of Agreement.  The contract provision at the center of this dispute is as follows:

> **5. Patents and Intellectual Property**
>
> With respect to patents and intellectual property held by Inspired Development Group, LLC (IDG), IDG and Boliari, EAD agree as follows:
>
> - IDG, LLC shall maintain the current exclusive license agreement with IPG, LLC.
> - The patents and intellectual property will remain with IDG, LLC until such time that at least 67% of the membership interest in IPG, LLC is sold.  This will be known as the Sale Event.
> - Upon the Sale Event, all right, title and interest to patents and all intellectual property will be assigned by IDG, LLC to IPG, LLC in perpetuity for a sum of $100.00 USD.
> - Prior to or at the time of the Sales Event, all royalties and monies due to IDG, LLC shall be paid in full.
> - IDG, LLC shall forgive all unpaid royalties payable by IPG, LLC except for $10,000 USD, which will be paid by IPG to IDG as soon as the first cash payment is received per item (1).
> - IPG, LLC will ensure that at least $3.0M in total royalties have been paid to IDG during the duration of the current license agreement with any remaining amount to this minimum royalty to be paid prior to or upon closing of the Sale Event.
> - If a catastrophic event (Force Majeure) causes financial hardship for IPG, LLC, the partners of IDG, LLC agree to a grace period of 180 days for accrual and subsequent payment of any royalties that are due.  The timing of payments shall be resolved by amicable negotiation and depending on the circumstances at hand.
> - Within 20 business days, IDG, LLC shall prepare a binding agreement to encapsulate the above points.

DE 1-2 at 3-4.

### A.  IPG's Obligations under Section 5 of the Binding Letter of Agreement

As quoted above, Section 5 of the Binding Letter of Agreement was preceded by the phrase "With respect to the patents and intellectual property held by Inspired Development Group, LLC (IDG), **IDG and Boliari, EAD agree as follows**." (emphasis added).  Thus, IPG was not bound by any

10

of the terms contained in Section 5 pursuant to the plain meaning of the words in that agreement. This stands in stark contrast *to every other section of the agreement*. Every section of the agreement other than Section 5 is preceded by the phrase "IPG, LLC and Boliari, EAD agree." To be sure, IPG is referenced in Section 5. For example, Section 5 states that "IPG, LLC will ensure that at least $3.0M in total royalties have been paid to IDG during the duration of the current license agreement" and it is this phrase upon which IDG's claim is based. The insertion of this phrase into Section 5, notwithstanding the fact that IPG was not bound by Section 5, is easily explained by the last sentence in Section 5, which reads: "Within 20 business days, IDG, LLC shall prepare a binding agreement to encapsulate the above points." Thus, it was necessary for IDG and IPG to reach an agreement on the specifics of the three million dollar payment. That agreement would be necessary, in light of the Patent License Agreement referenced in Section 5, because the Patent License Agreement provided IPG the right to terminate the Patent License Agreement for no liability whatsoever. The clash of such an unfettered, liability-free right, with a provision requiring a minimum three million dollar royalty payment,[6] would necessarily require some modification to the Patent License Agreement—a modification which is expressly provided for in Section 5.[7] The burden for the preparation of the "binding agreement to encapsulate" Section 5 fell upon IDG, and it is undisputed IDG did not draft or proffer such an agreement. DE 103 at 4. In summary, IPG cannot be sued for the breach of a covenant when there is no covenant for it to breach. IPG is therefore entitled to summary judgment as to Count II on this basis.

---

[6] The three million dollar payment was much larger in scope than any other minimum payment otherwise required by the Patent License Agreement.

[7] While IPG's unilateral right to terminate the Patent License Agreement did not relieve it of its obligation to pay royalties, its obligation to pay royalties was limited to obligations "set forth herein." DE 1-1 at 9. Thus, as set forth above, some sort of amendment to the Patent License Agreement would be necessary to properly incorporate the terms of Section 5 of the Binding Letter of Agreement, terms that IPG was not bound to in the Binding Letter itself.

### B. The Conditions upon which IDG was Entitled to a Royalty Payment under the Binding Letter of Agreement

Even if the Court scrutinizes the contents of Section 5, the condition precedent for a three million dollar payment was undisputedly never achieved in this case.[8] In Florida, "in interpreting contractual language to determine the rights and obligations of the parties to the agreement[,] the contract must be considered as a whole in an effort to give meaning to all of its terms." *Brown v. Fin. Serv. Corp. Int'l*, 489 F.2d 144, 150 (5th Cir. 1974). As summarized by the Florida Supreme Court:

> The words of a contract will be given a reasonable construction, where that is possible, rather than an unreasonable one, and the court will likewise endeavor to give a construction most equitable to the parties, and one which will not give one of them an unfair or unreasonable advantage over the other. So that interpretation which evolves the more reasonable and probable contract should be adopted, and a construction leading to an absurd result should be avoided.

*James v. Gulf Life Ins. Co.*, 66 So. 2d 62, 63 (Fla. 1953) (quoting 17 C.J.S., Contracts, § 319).

Here, the Court concludes there is a single, reasonable interpretation of Section 5. First, a potential investor in IPG, Boliari, EAD, wanted assurance that IDG would continue to permit IPG to have exclusive access to IDG patents, as evidenced by bullet point one of Section 5. Second, IDG was permitted to retain ownership of the patents until a sale event occurred, as evidenced by bullet point two. Third, upon a sale event, ownership of the patents would transfer from IDG to IPG and the consideration for that transfer was nominal—a mere $100.00—as evidenced by bullet point three. Because of this nominal consideration, IDG was to be entitled to a payment of three million dollars minus all accrued royalty payments for transferring its patents in connection with a sale event, as evidenced by bullet point six. When read in its entirety, Section 5 is clearly intended to serve as a

---

[8] The Court rejects IDG's contention that there is a dispute of material fact whether a sale event ever occurred. The operative question is not whether at any point in time whatsoever shares in IPG were sold to some third party, but whether the sale event contemplated in Section 5 of the Binding Letter of Agreement ever occurred. The sale event contemplated in Section 5 required IDG to transfer its patents to IPG in connection with a sale event and to receive compensation in return. IDG has proffered no evidence on summary judgment it transferred, or even attempted to transfer, its patents to IPG in connection with a sale event as contemplated in Section 5.

foundation for a future sale event—a mechanism to make such a sale event possible. A purchaser in the future would have assurance that a purchase of IPG would include a purchase of IDG patents and IDG, as a seller, would have assurance that it would receive a minimum amount of compensation for its patents in connection with that sale event. IDG's compensation was tied to time. If a sale event happened quickly, IDG was poised to reap great financial rewards.[9] By contrast, if a sale event did not occur for a lengthy period of time, IDG's bonus compensation for a sale event would have been very little, or nothing. With the totality of Section 5 in mind, the Court turns to the contractual phrase forming the basis of the dispute before the Court:

> IPG, LLC will ensure that at least $3.0M in total royalties have been paid to IDG during the duration of the current license agreement with any remaining amount to this minimum royalty to be paid prior to or upon closing of the Sale Event.

DE 1-2 at 4.

IPG reads this phrase in its entirety as meaning that the three million dollar payment obligation was triggered by a sale event. If a sale event occurred, the three million dollar payment would have been made at or prior to the event. If there was no sale event, IPG argues, then there could be no payment obligation. IDG argues that this language means it was guaranteed three million dollars—period. If the Court were to read this clause in complete isolation, the Court may deem the clause ambiguous. Upon reading Section 5 and the Binding Letter of Agreement in its entirety, however, the Court sees no ambiguity in Section 5. The purpose of Section 5 is clearly to establish a working mechanism by which a future sale event is possible by virtue of assurance to a prospective IPG purchaser that the IDG patents would be included in the purchase at the time of purchase or prior to a purchase. The purpose of Section 5 is not to guarantee IDG a minimum royalty payment, regardless of whether a future sale event occurs or not. Indeed, the party who would be required to make such a

---

9 Such a financial gain would be premised upon the monetary value of IDG's patents *not* being in excess of three million dollars. As referenced above, IPG ultimately came to the conclusion that the value of IDG's patents was zero.

13

payment, IPG, is not even bound by Section 5. In the absence of a sale event, the three million dollar payment referenced in Section 5 is not triggered. The authority relied upon by IDG, such as *Solymar Invs., Ltd. v. Banco Santanders S.A.*, No. 10-20695, 2011 WL 1790116, at *7 (S.D. Fla. 2011), is of no import. Cases such as *Solymar* stand for the proposition that a condition precedent must be explicit and unambiguous, but for the reasons set forth above the Court concludes that the payment of three million dollars in Section 5 *was* clearly and unambiguously contingent upon a sale event.

Furthermore, IDG's proffered interpretation of Section 5 leads to "an absurd result." *James*, 66 So. 2d at 63. The three million dollar payment in Section 5 is clearly the consideration for the transfer of IDG's patents to IPG. Pursuant to IDG's interpretation, IDG is entitled to a payment of three million dollars even if its patents are not transferred in connection with a sale event. By contrast, IPG's proffered interpretation is reasonable and does not lead to an absurd result. Under IPG's interpretation, which this Court agrees with, if no sale event occurs and the relationship between IPG and IDG were terminated, as it was in this case, IDG retains the full value and benefit of its patents to do with as it pleases.

### C.  The Enforceability of the Binding Letter of Agreement

As a final matter, the Court briefly addresses the parties' arguments on whether the Binding Letter of Agreement is an unenforceable agreement-to-agree. IPG has made no argument on summary judgment, as IDG persists it has, that the Binding Letter of Agreement is an unenforceable agreement. IPG has merely argued that Section 5 of the Binding Letter of Agreement does not require it to do anything and, at best, Section 5 may be construed as requiring IPG and IDG to prepare an amendment (with the burden for such preparation and presentation on IDG) to their pending Patent License Agreement. For all of the reasons set forth above, the Court agrees with IPG that the Binding Letter of Agreement does not impose an obligation on IPG in Section 5, and the Court sees no reason to conclude

that the Binding Letter of Agreement itself, or any section of it, is illusory or otherwise a mere agreement-to-agree, as to the parties before this Court. Section 5 of the Binding Letter of Agreement applied to IDG and Boliari, but IDG has elected not to sue Boliari and Boliari is not before this Court.

For all of the foregoing reasons, IPG is entitled to summary judgment as to Count II and IDG is not.

### Count III – Unjust Enrichment

IDG has brought a claim for unjust enrichment "[a]s an alternative to Counts I and II." DE 1 at 11. Unjust enrichment is unavailable to a plaintiff when an express contract exists between the parties concerning the same subject matter. *State Farm Mut. Auto. Ins. Co. v. Physicians Injury Care Ctr., Inc.,* 427 F. App'x 714, 722 (11th Cir. 2011) (citing *Williams v. Bear Stearns & Co.*, 725 So. 2d 397, 400 (Fla. Dist. Ct. App. 1998)); *Diamond "S" Dev. Corp. v. Mercantile Bank*, 989 So. 2d 696, 697 (Fla. Dist. Ct. App. 2008) (holding an "unjust enrichment claim [is] precluded by the existence of an express contract between the parties concerning the same subject matter"). While IDG has cited case law for the proposition that a claim for unjust enrichment may be brought as an alternative pleading when the enforceability of a contract is challenged, the Court has already ruled, *supra*, that there is no basis for this Court to conclude that the Binding Letter of Agreement or the Patent License Agreement is unenforceable. As a result, IDG's unjust enrichment claim cannot survive as to any subject matter addressed by the Patent License Agreement or the Binding Letter of Agreement.

IDG's briefing on this issue, however, has muddled what otherwise should be a straight forward matter. IDG argues in its response to IPG's motion that it intends to seek damages for unjust enrichment pertaining to IPG's use of its patents and concepts for time periods *after* IPG terminated the Patent License Agreement. DE 1 at 12; DE 100 at 27. Thus, it appears to be IDG's contention, at least in the present, to pursue Count III for matters outside the scope of contract in this case. IDG pled Count

15

III by alleging "Plaintiff conferred a benefit on Defendant by licensing and allowing Defendant to use its utility and design Patents in the manufacturing and sale of the KidsEmbrace 'Human Form' cartoon-and-superhero-themed children's safety seats," but IDG conferred that benefit upon IPG by permitting IPG to terminate the arrangement (the Patent License Agreement) at any time, unilaterally, without liability for doing so. It is therefore unclear to the Court: (1) how IDG could seek damages for post-termination unjust enrichment in light of IPG's right to terminate without liability, (2) how IDG would otherwise choose to seek damages post-termination for IPG's use of its patents and concepts, and (3) how IDG could seek damages for IPG's alleged use of its patents through an unjust enrichment theory in lieu of a patent infringement theory or, alternatively, how such a theory could be presented (if applicable) to a jury without evidence of patent infringement. No claim for patent infringement is before this Court.

As a result of the foregoing, to the extent IDG seeks to press its unjust enrichment claim outside the bounds of contract in this case, the Court lacks clarity on IDG's intent to do so and, moreover, the Court cannot discern the theory upon which IDG would press such a claim. As best as the Court is able to view the argument and evidence before this Court, IDG does not have an unjust enrichment claim that can survive summary judgment for two reasons. First, a claim seeking damages subsequent to the termination of the Patent License Agreement for unjust enrichment would be barred by the terms of the Patent License Agreement. Second, IDG has not pled its unjust enrichment claim as a claim *in addition to* the matters addressed by contract in this case. Instead, IDG expressly pled Count III as being in the alternative to Count I and Count II. The Court therefore construes IDG's Count III as being limited to the subject matter contained in the contracts in this case, and not to matters that arose after the Patent License Agreement was terminated. The Court concludes that the contracts in this case govern the

16

subject matter of Count III; Count III cannot survive for this reason, and for all of the reasons set forth above IPG is entitled to summary judgment as to Count III.

### Count IV – Promissory Estoppel

IDG has brought Count IV, a promissory estoppel claim, in the alternative to its Count II breach of contract claim premised on the Binding Letter of Agreement. More specifically, IDG seeks damages for the three million dollars it argues it was promised in connection with the drafting of the Binding Letter of Agreement. IDG has pled: "These promises are contrary to Defendant's later asserted position that Plaintiff is not entitled to a minimum of $3,000,000 in royalty payments." DE 1 at 12. IDG's allegation that it is owed the three million dollars referenced in the Binding Letter of Agreement has already been addressed by this Court and a claim for promissory estoppel cannot stand when the subject matter supporting the promissory estoppel claim is directly addressed in a written agreement. Promissory estoppel is unavailable in cases where a written contract covers the subject matter in dispute between the parties. *See Advanced Marketing Sys. Corp v. ZK Yacht Sales*, 830 So. 2d 924, 928 (Fla Dist. Ct. App. 2002); s*ee also Jhaver v. Zapata Off-Shore Co.*, 903 F.2d 381, 385 (5th Cir. 1990) (observing that "[u]nder Texas law, a contract comprising the disputed promise precludes recovery under promissory estoppel"); *Borowski v. State Chem. Mfg. Co.*, 97 Ohio App. 3d 635, 647 (1994) (holding that "[p]romissory estoppel does not apply to oral statements made prior to the written contract, where the contract covers the same subject matter"). "'Promissory estoppel is not a doctrine designed to give a party to a negotiated commercial bargain a second bite at the apple in the event it fails to prove breach of contract."' *Gen. Aviation, Inc. v. Cessna Aircraft Co.,* 915 F.2d 1038, 1042 (6th Cir. 1990) (quoting *Walker v. KFC Corp.,* 728 F.2d 1215, 1220 (9th Cir. 1984)).

As the Court has already discussed, the terms upon which the three million dollar payment would be disbursed, pursuant to the agreement, were never met. Similarly, the conspicuous absence of

17

IPG from the provisions of the Binding Letter Agreement at issue, *while remaining bound to all other provisions*, shows that the parties, upon entering into the Binding Letter of Agreement, did not intend for IPG to be bound by that provision. IDG cannot pursue a claim for promissory estoppel when a written agreement directly addresses the disputed issue. *Coral Reef Drive Land Dev. LLC v. Duke Realty Ltd. P'ship*, 45 So. 3d 897, 902 (Fla. Dist. Ct. App. 2010) ("Promissory estoppel . . . is an equitable doctrine for the enforcement of agreements, not a device to nullify an expressly-agreed, written contractual term."). There is no basis upon which to conclude that the contracts in this case are unenforceable. For these reasons, IPG is entitled to summary judgment as to Count IV.

### IV.   CONCLUSION

For all of the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that:

1. IPG's Motion for Summary Judgment [DE 74] is **GRANTED** as to Count II, Count III, and Count IV, and **DENIED** as to Count I;

2. IDG's Motion for Summary Judgment as to Count II [DE 77] is **DENIED**; and

3. Because the Court previously dismissed IPG's counterclaims without prejudice, IDG's Motion for Summary Judgment as to IPG's counterclaims [DE 77] is **DENIED AS MOOT** and Counter-Defendant Prine's Motion for Summary Judgment as to IPG's Counterclaims [DE 58] is **DENIED AS MOOT**.

**DONE and ORDERED** in Chambers, Fort Pierce, Florida, this 31st day of January, 2017.

_____
ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Copies furnished to Counsel of Record